558 So.2d 102 (1990)
ROOSE & GRIFFIN LANDSCAPE CONTRACTORS and Crims, Inc., Appellants,
v.
Mildred WEISS, Appellee.
No. 89-975.
District Court of Appeal of Florida, First District.
March 5, 1990.
*103 Douglas F. Miller of Clark, Partington, Hart, Larry, Bond, Stackhouse & Stone, Pensacola, for appellants.
Norton Bond, Pensacola, for appellee.
ZEHMER, Judge.
The appealed workers' compensation order awarded the claimant, Mildred Weiss, permanent total disability benefits. The well-reasoned order of the judge of compensation claims is quoted in pertinent part:
The Industrial Claims Court, District A-West, finds as follows:
1. This is a claim for compensation pursuant to F.S. 440 and this Court has jurisdiction over the parties and this cause.
2. The claimant is a 54 year old woman who left school in the third or fourth grade and was put to work on a farm by an abusive alcoholic father. She has worked as an unskilled laborer all of her life in addition to raising four children.
3. On December 10, 1985, while working as a laborer for the employer, she fell and injured her back. The compensability of the claim is not at issue. Initially, she received medical treatment at a clinic in Gulf Breeze. She was advised to try light work but after two attempts to return to work failed she was referred to an orthopedic surgeon. She was first seen by Dr. Roth but eventually she ended up under the care of Dr. John O. Grimm who at the time of her first visit in July of 1986 was associated with the Medical Center Clinic in Pensacola.
4. Dr. Grimm diagnosed degenerative disc disease. Based on a diskogram performed in January of 1987, he thought she had a defective intervertebral disc at the L5-S1 level of her spine. He recommended surgery which would have resulted in a fusion of her lower vertebrae but the claimant declined out of fear of possible paralysis. According to Dr. Grimm, without the surgery the claimant reached maximum medical improvement (MMI) on August 25, 1987 and had an 8% permanent partial impairment (PPI). He was of the opinion she was extremely limited in what she could do and restricted her lifting to objects under 10 pounds. He also advised against stooping, bending and climbing. He was also of the opinion that the claimant could not be relied upon to do even sedentary work on a full-time basis.
5. Beginning in August of 1986, the employer/servicing agent (e/sa) had the claimant placed under surveillance. At a cost in excess of $13,000  equal to almost three years of wage-loss benefits  observed the claimant for 476 hours at various times. Seven videos were made  four of which the e/sa introduced into evidence. Of those four, only the last three made on successive days in January of 1988 are of any significance. These videos show the claimant doing some light gardening. They show a woman who appears to be much older than the claimant's stated age of 54. They also show a woman whose movements are exceedingly slow and deliberate. Apparently based on the surveillance reports from the investigators, the *104 e/sa suspended wageloss benefits beginning in November of 1987. It must be noted at this point that benefits were suspended before the videos of the claimant's gardening activities were taken.
6. After she was notified by the e/sa of the requirement to conduct a work-search in December of 1987, the claimant began to look for work. With little or no guidance from the e/sa, she routinely made various inquiries from prospective employers. She has yet to find anyone who would hire her. Although not overwhelming in its intensity, her job search is adequate considering her educational level, limited work history and the work restrictions imposed by Dr. Grimm.
7. In November of 1987, the claimant was seen by Dr. Lawrence J. Gilgun who is a clinical psychologist with offices in Pensacola. He tested the claimant and based thereon he was of the opinion the claimant's full scale intelligence quotient was low enough to be classified as borderline mentally defective. According to Dr. Gilgun, 95% of the adult population have a higher I.Q. Achievement tests confirmed the claimant's testimony that she was illiterate. In addition to her low I.Q., Dr. Gilgun suspects she probably has a learning disorder. This acts to compound the adverse effect of her low I.Q. and prohibits her from even achieving the highest level of her rather limited academic potential. He assigned a 5% PPI to her low I.Q. plus an additional 5% on account of her apparent learning disability. Most importantly, Dr. Gilgun is of the opinion that the claimant cannot be retrained for another occupation. This opinion was also reached by Joseph M. Miller who is a rehabilitation counselor. According to Mr. Miller's testimony at trial, the claimant is not a realistic candidate for rehabilitation. Mr. Miller also noted that her illiteracy excludes her from most sedentary jobs. Mr. Miller was of the opinion that the claimant was basically unemployable. After reviewing the surveillance films introduced into evidence by the e/sa, he continued to hold to his opinion that the claimant was presently unemployable and not a candidate for rehabilitation.
8. In addition to Dr. Grimm, the claimant was also seen by Dr. Richard Matthews who is a family practitioner. At one time he had performed physical examinations for the Rehabilitation Institute of West Florida. In this capacity, he saw the claimant on September 3, 1987 and, at that time, confirmed a staff evaluation limiting the claimant to part-time sedentary work. He was shown the four videos submitted by the e/sa (Employer/Servicing Agent's Exhibit # 1) and after 90 pages of laborious deposition testimony indicated that it might be of some benefit to have the claimant re-evaluated but would not withdraw his initial opinion confirming the limitations against all but part-time sedentary work. Based on his experience with patients with back pain, he noted that often such people have periods of time when they seem to improve only to later relapse into another cycle of debilitating pain. Commenting on the videos, Dr. Matthews indicated that he was "... not comfortable making an assessment that someone could do light duty everyday the rest of their life in just two or three days that were video tapes" (Employer/Servicing Agent's Exhibit # 1 at p. 24). When asked to give a definitive opinion regarding the effect of his initial opinion that the claimant was actually limited to sedentary work, Dr. Matthews testified that his examination was consistent with someone limited to sedentary work or perhaps even light duty work, however he "... felt more comfortable with saying she could sedentary work ..." (Id at p. 17). It should be noted that the lengthy deposition debate "raged" over whether the claimant could do part-time sedentary work or light work! Taken as a whole, Dr. Matthews' testimony actually supports the claimant's contention that she is limited to part-time sedentary work despite the videos showing her doing some light gardening. It is also worthy of note that Dr. Matthews only saw the claimant one time for about one-half hour in September of 1987.
9. Dr. Grimm was also shown the video tapes of the claimant. They did not change his mind. He continued to hold to his *105 original opinion that she cannot do even sedentary work on a full-time basis.
10. Of the many factors that should be considered in making a determination of PTD, there are precious few tending to support the position of the e/sa. Almost every factor normally considered in determining PTD supports the claimant's position that she is entitled to such benefits. The few hours of video tapes showing this prematurely elderly and illiterate woman with a marginal I.Q. doing light gardening work cannot overcome the overwhelming evidence indicating she is PTD.
11. Among those factors that support her claim are:
(a) Although the claimant has a relatively modest physical impairment rating, the work restrictions imposed by her doctors are extensive. Dr. Grimm is of the opinion that she is unable to even do sedentary work on a full-time basis. Based on his one-half hour exam and his review of the four videos, Dr. Matthews remains convinced the claimant is probably limited to sedentary work but he would not be adverse to the possibility that she might be able to do light work.
(b) The claimant's age is a handicap to her re-employment. Although 54 is far from a retirement age, it is an age where prospective employers might have serious reservations about attempting to train someone for a new job. Assuming the claimant does perhaps have some rehabilitation potential, it is doubtful that a prospective employer would be willing to devote sufficient resources to an employee who may not be around long enough to justify its investment in any retraining program.
(c) The claimant's work history is a major handicap to her reemployment. Except when she was required to devote time to her four children, the claimant has worked as a farm worker, factory worker or as a plant nursery worker. She is so profoundly illiterate that she was compelled to take the Florida driver's license exam orally. As noted by Mr. Miller, she is realistically not employable and not a candidate for re-employment. There seems to be a consensus among the various professionals who have examined the claimant that she has an extremely limited work history and ill-suited for most sedentary or even light work.
(d) The claimant's illiteracy and marginal I.Q. is a major handicap to her re-employment. According to the uncontradicted testimony, she suffers from a physical and mental handicap which have combined to prevent her from doing manual labor in the future as she did in the past. Her dismal educational achievement level is such that she is ill-suited for most sedentary work and, for that matter, even light work.
(e) The claimant has been unable to obtain any work she can perform in her after-injury condition. It must be noted she has been advised not to return to work by her doctors. Dr. Grimm limits her to light sedentary work. There was very little sedentary work available to the claimant following her injury.
(f) The claimant has been unable to earn any wages on a sustained basis since her injury. All of the medical experts agree that the claimant has had substantial impairment for the past four years. None have recommended a return to any form of sustained manual labor.
(g) The claimant's back injury combined with her pre-existing mental handicaps have severely handicapped her ability to compete in the open labor market. As noted above, she is by work history and mental handicap ill-suited for most sedentary jobs.
(h) All who have seen her professionally agree that she should not return to manual labor.
(i) As noted above, the claimant has conducted an adequate work search considering her age, limited education and severe mental handicap. Dr. Grimm has indicated she is not able to do even sedentary work on a full-time basis. The rehabilitation counselor was of the opinion that the claimant was unemployable. Considering the extensive nature of her injury, the claimant has satisfactorily demonstrated that she *106 has conducted a good faith work search. Unfortunately, no one would hire her.
12. Except for the videos taken of the claimant in January of 1988 showing the claimant might be capable of some light gardening, there is nothing in the record indicating she is capable of even light work on an uninterrupted basis. There are no factors which immediately come to mind tending to militate toward a finding that the claimant is not entitled to compensation for PTD. Considering the above findings, the claimant has satisfactorily proven that she is unable to do light work on an uninterrupted basis. For that reason, the e/sa must provide her compensation for TTD as claimed.
13. Although Dr. Grimm and Dr. Matthews are in substantial agreement regarding the claimant's condition and work restrictions imposed thereby, the opinions of Dr. Grimm are accepted as controlling where a conflict does exist. Dr. Grimm had a much more intense professional relationship with the claimant and is more qualified to diagnose, treat and evaluate back injuries than Dr. Matthews. Dr. Grimm has fixed MMI at August 25, 1987. Although Dr. Gilgun did not specifically assign a psychological MMI, he did assign a PP1 rating when he examined the claimant on November 23, 1987. His testimony strongly implies a psychological MMI at some time before [s]he first saw him. Rather than require the parties to redepose Dr. Gilgun, November 23, 1987 is hereby assigned the date of psychological MMI.
14. According to the pretrial stipulation, a timely Notice to Controvert was filed. For that reason, no penalties are due. However, the claimant is entitled to recover interest and taxable costs. In this case, the e/sa did accept compensability of the claim and paid benefits. For that reason, attorney's fees are not due under F.S. 440.34(3)(c). However, the evidence supporting the claim for PTD is overwhelming. The only evidence tending to show this illiterate and mentally deficient 54 year old woman might not be PTD was a few hours of video tapes showing the claimant doing some gardening. This was obtained after some 400 hours of surveillance of the claimant. Requiring a claimant to go to trial to prove the obvious has been held to be bad faith as contemplated under F.S. 440.34(3)(b). Brevard Community College v. Barber, 488 So.2d 93 (Fla. 1st DCA 1986). Jurisdiction should be reserved to consider an application for a hearing on the question.
WHEREFORE, having heard the testimony, considered the evidence, observed the candor and demeanor of the witnesses, heard the argument of counsel, and resolved all conflict, the employer, ROOSE & GRIFFIN LANDSCAPE CONTRACTORS, by and through its servicing agent, CRIMS, INC., is hereby ORDERED as follows:
A. Pay to the claimant compensation for permanent total disability from December 1, 1987 (the date wage-loss benefits were suspended) to date and into the future for as long as she is legally entitled to such benefits.
B. Pay to the claimant interest on all past due benefits awarded herein.
C. Reimburse the claimant or her attorney for taxable costs.
D. Jurisdiction is hereby reserved to consider an application for a fee under F.S. 440.34(3)(b).
After careful consideration of the record, we conclude that the findings of fact are supported by competent substantial evidence and that the conclusions of law accord with section 440.15, Florida Statutes (1987), and the relevant court decisions construing and applying chapter 440.
Appellants argue primarily that the opinion testimony of the expert witnesses presented to the judge has no evidentiary value and thus cannot support the findings. They concede that the evidence is admissible, but argue that assumptions on which such testimony was based is not supported by credible testimony and evidence. We firmly reject this contention. The probative value and weight to be given to such expert testimony was a question for the trier of fact in this case, as was the credibility of the witnesses who testified. Moreover, during the hearing appellants made no objections or motions to strike *107 such expert testimony for lack of competency or record support so as to afford the judge below an opportunity to rule on these grounds. Appellants' argument is presented for the first time on appeal, and thus has not been properly preserved for appellate review. See Rinker Materials Corp. v. Hill, 471 So.2d 119 (Fla. 1st DCA 1985); Sears, Roebuck & Co. v. McAfoos, 303 So.2d 336 (Fla. 3d DCA 1974).
AFFIRMED.
SHIVERS, C.J., and JOANOS, J., concur.